**Freddie Lee CLARK, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–85–239–CR.**

Court of Appeals of Texas,
Fort Worth.

Dec. 29, 1989.

Robbie Edmonds, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., C. Chris Marshall, and David K. Chapman, Asst. Crim. Dist. Attys., Fort Worth, for appellee.

Before JOE SPURLOCK, II, KELTNER and MEYERS, JJ.

OPINION ON REMAND

KELTNER, Justice.

The primary issue in this case is whether the trial court's erroneous admission of a videotape of the complaining witness, prepared out of the presence of the defendant,

was harmless beyond a reasonable doubt. We also must consider whether the court's erroneous charge on good time and parole was harmless beyond a reasonable doubt.

We hold both errors are harmless beyond a reasonable doubt and affirm the trial court's conviction.

This case reaches us on remand from the Texas Court of Criminal Appeals. Previously, Freddie Lee Clark appealed his conviction by a jury of the offense of aggravated sexual assault. *See* TEX. PENAL CODE ANN. sec. 22.021 (Vernon 1989). The jury assessed his punishment, enhanced by two prior felony convictions, at life imprisonment in the Texas Department of Corrections. In his original appeal to this court, we affirmed Clark's conviction and rejected his arguments that a videotape of the complainant prepared pursuant to article 38.072 of the Texas Code of Criminal Procedure was unconstitutional. *Clark v. State*, 728 S.W.2d 484 (Tex.App.— Fort Worth 1987) (en banc).

Clark sought a petition for discretionary review from the Court of Criminal Appeals. Subsequent to our opinion, the Court of Criminal Appeals, in another case, held that section 2 of article 38.072 of the Texas Code of Criminal Procedure was unconstitutional. *Long v. State*, 742 S.W.2d 302 (Tex.Crim.App.1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988). As a result of the decision in *Long*, the Court of Criminal Appeals vacated our judgment and remanded the cause to us for a harm analysis pursuant to TEX.R.APP.P. 81(b)(2). *Clark v. State*, 753 S.W.2d 371 (Tex.Crim.App.1988) (opinion on reh'g).

Although not mentioned by the Court of Criminal Appeals or raised by appellant on remand, we note that no appellate court has reviewed Clark's contention that the trial court erred in instructing the jury on good time and parole law pursuant to article 37.07, sec. 4 of the Texas Code of Criminal Procedure. Since Clark's brief was filed, the Texas Court of Criminal Appeals has held that article 37.07 violates the Texas Constitution. *Rose v. State*, 752 S.W.2d

529 (Tex.Crim.App.1988) (opinion on reh'g) (en banc). However, the Court of Criminal Appeals held that any error in instructing pursuant to article 37.07 must be subjected to the harmless error analysis to determine whether the case should be reversed. *Rose*, 752 S.W.2d at 553–55.

As a result, we must review the facts of this case to determine if the court's errors in admitting the videotape and instructing on parole and good time law were harmless beyond a reasonable doubt. Stated another way, once error is established, we must reverse unless we determine beyond a reasonable doubt that the error made no contribution to the conviction or the punishment. TEX.R.APP.P. 81(b)(2). In this light, we review the indictment, the evidence, the court's charge, and the arguments of counsel.

Clark was charged in a three-count indictment with the offenses of aggravated sexual assault of a child and indecency with a child, with two prior felony convictions alleged for enhancement. After the evidence was presented, the State elected to proceed to the jury on only one count, which alleged aggravated sexual assault by means of anal intercourse.

A videotape of the victim, a young boy of seven years of age, was introduced through Jacky Paul Smith, an investigator in the Crimes Against Children Unit of the Tarrant County District Attorney's office. On the videotape the victim stated he was seven years of age, and had spent the night at his cousin's house in April, 1985. The victim testified he was in bed asleep when Clark awakened him, removed his underwear, and forced him to submit to anal intercourse. The victim also testified he was forced to suck Clark's penis. The victim demonstrated his testimony with the use of anatomically correct dolls.

After the videotape had been shown to the jury, the victim took the witness stand outside the presence of the jury. In accordance with former article 38.06(2) of the Code of Criminal Procedure, the court examined the victim and determined he was competent to testify.

The State then called the victim to the witness stand in the presence of the jury. He testified in general terms that all of his videotape statements were true. He was then asked specific questions about the offense. Specifically, the victim testified he went to his cousin Jo Ann's house to spend the night and play with her two children. He slept in Clark's bed, because it was the only bed available. The victim testified he was awakened by appellant, who took off his underwear, and got on top of the victim. He testified that Clark moved up and down on him and as he did, he put his "weiner" in the victim's bottom. The victim testified that Clark hurt him; he could not call out, however, because Clark held his hand over the victim's mouth.

The victim identified Clark as the person who assaulted him. He further testified Clark was his cousin, and stated he was certain it was Clark who attacked him.

At the conclusion of the victim's direct testimony, the prosecutor asked if Clark did "anything else with his weiner to you that night." The victim replied, "No," despite his previous testimony on the videotape that he had been forced to suck Clark's penis.

On cross-examination, the victim testified that a number of other adults other than Clark were at the house that evening. Moreover, the victim also testified that after the attack, he "wash[ed] off" and went to the house next door to spend the rest of the night.

Clark's lawyer was also allowed to elicit testimony with regard to making the videotape. When the victim was asked what people do when they make movies, he replied, "They practice." The victim stated he talked with Jacky Smith, the investigator, approximately two minutes before making the movie. He said that Smith "kind of" helped him along with some of the answers he gave on the videotape.

The State also called the victim's aunt, D.B., who testified she awoke to find the victim at her house on Saturday morning, April 27. She testified this was not uncommon, because the victim and her daughter were the same age and often played together.

However, on this Saturday, the victim was not playful and appeared to be in pain. In a conversation with her daughter, D.B. inquired whether anything was wrong with the victim. This exchange led her to subsequently ask the victim if anyone had messed with him. He replied that "Freddie" had "messed with him," and had "screwed him in his behind." D.B. then examined the victim's "rear end" and observed that it was red, puffed, and swollen. She put ointment on the swollen area and called the victim's mother to tell her that he needed assistance.

E.C., the victim's mother, testified that D.B. was her sister and Clark was the victim's second cousin. She testified that D.B. lived in one side of the duplex with her daughter and boyfriend; her first cousin, Jo Ann Clark, and appellant Clark, lived on the other side of the duplex with several other people.

E.C. testified the victim asked her if he could spend Friday night, April 26, with Jo Ann's children. After talking with Jo Ann, E.C. told him he could.

E.C. testified D.B. called her at work the next day and informed her that the victim had been sexually abused. She left work, talked to her son, and called the police.

She also examined the victim and found his "behind" red and swollen. However, she did not take him to the hospital, because a police officer investigating the incident commented that it would not "do much good." Evidently, the officer came to this conclusion after learning that the victim had washed himself and was later bathed after the assault.

The first defense witness was Jo Ann Clark, sister of the accused. She testified she was Clark's sister and the victim's cousin.

During her testimony, Jo Ann described the close living conditions of the small du-

plex she shared with her brother, husband, and two children. She said the duplex was so small that she would have heard the victim go to the bathroom and turn on the faucet, as he testified earlier. She also testified she would have known if any unusual noise or event had taken place in Clark's bedroom. She denied anything unusual occurred that night and denied hearing the victim go to the bathroom.

However, she testified that after the victim fell asleep, she put him on appellant's bed. When she awakened the next morning at approximately 9:00 a.m., the victim was already next door at D.B.'s duplex. Jo Ann testified that Clark left the duplex between 11:00 p.m. and 12:00 a.m. on the night the offense occurred, stating he was going to Mineral Wells. According to Jo Ann, he did not return to the duplex that night, but did drive with her to work the next morning. She testified that on the way to work with the victim's mother, Clark expressed a need for sexual gratification.

On cross-examination, Jo Ann acknowledged that she would like to help Clark. She further testified that during the late hours of the night, Clark was the only adult male in the duplex, except that "he had left" at approximately 11:00 p.m. to 12:00 a.m.

She also testified the victim was well acquainted with Clark, because the victim was a frequent visitor to both sides of the duplex. She testified "there would be no mistaking about him identifying" Clark.

Clark then called Raymond Poole, who testified that he went to Mineral Wells with Clark sometime during the month of April. Poole testified they went on a weekend, leaving late one evening and returning the next evening. To the best of his recollection, the two left on a Saturday and came back on a Sunday. At the time of his testimony, he admitted being a resident of the Tarrant County jail and acknowledged two prior felony convictions.

Clark also called Frederick Branch to testify on his behalf. Branch testified that he went on a trip to Mineral Wells with Clark. He testified the journey began late one night but could not recall the date on which it began. However, he believed the trip took place during the middle part of April rather than the end of the month, when the assault occurred.

The court's charge to the jury on guilt/innocence contained only the one count of aggravated sexual assault by means of anal intercourse. The charge made no reference to the videotape or the testimony of the victim.

The arguments at the guilt/innocence stage of the trial did not emphasize the videotape. In fact, the State's opening argument made only a passing reference to the videotape, amounting to only two lines of almost five full pages of argument. Simply stated, the State indicated that the victim told his story through the videotape. However, the State emphasized the victim's trial testimony and argued that his presence "here today" was courageous and by his appearance, he was seeking justice. The rest of the argument was devoted to analysis of certain parts of the charge and a summary of the State's witnesses, emphasizing the testimony of the outcry witnesses.

Clark's lawyer, however, did mention the videotape and used the videotape to convince the jury that the victim's testimony was not reliable. Specifically, Clark's lawyer pointed out there were inconsistencies between the videotape and the live testimony, stating:

> You've had an opportunity to view the videotape and I think that you will find there are some glaring inconsistencies from what was betrayed [sic] from that monitor and what was related from the witness stand by [the victim].

This argument was an obvious reference to the difference between the victim's trial testimony and one of his assertions on the videotape. On the tape the victim testified that he was forced to suck Clark's penis; at trial, however, he denied Clark had done anything with his "weiner" beyond anal intercourse.

Otherwise, Clark's argument centered around the State's heavy burden of proof. However, he did address several specific factual issues, all unrelated to the videotape. For example, Clark's lawyer suggested the true guilty party was not Clark, but an "irresponsible parent." He relied heavily on Jo Ann Clark's testimony that she would have known if anything unusual had happened in the duplex. He also pointed out the testimony from two unrelated witnesses regarding the alleged trip to Mineral Wells.

The State's rebuttal argument at guilt/innocence contained several brief references to the videotape. However, the State placed special emphasis on the victim's live testimony before the jury, especially the victim's testimony on cross-examination. The State concluded with a summary of the elements of the offense and a general argument that the State proved its case beyond a reasonable doubt.

After the jury had found Clark guilty of aggravated sexual assault, evidence was presented at the punishment stage of the trial. The only testimony at the punishment phase was that of Penny Davis, a finger printing expert, through whom Clark's penitentiary packets were introduced. These penitentiary packets demonstrated Clark's two prior felony convictions. There was no reference to the videotape at the punishment stage of the trial.

The court's charge on punishment contains no reference to the videotape, but does contain the instructions on good time and parole law pursuant to article 37.07 of the Texas Code of Criminal Procedure. TEX.CODE CRIM.PROC.ANN. art. 37.07 (Vernon Supp.1989). After the statutory instruction, the trial court instructed the jury:

> It cannot accurately be predicted how the parole law and good conduct time might be applied to this Defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

Neither party argued the good time or parole law instruction. The State, however, consistently urged the jury to impose a maximum sentence of life in the penitentiary. In doing so, the State's rebuttal argument asked the jury to ignore the instruction on parole law issued by the trial court:

> There is an instruction in here about parole law. I don't think that should even be a part of your consideration. Just determine what is the proper sentence for this man under these facts that you have got before you, and then just give him the proper sentence, life in the penitentiary.

The jury returned the maximum sentence of life in the Texas Department of Corrections.

We hold the introduction of the videotape was harmless beyond a reasonable doubt for several reasons.

■ First, the victim took the stand immediately after the videotape was introduced and testified fully about the offense. Thereafter, the victim was cross-examined about both the videotape and his direct testimony. Introduction of such a videotape has been declared unconstitutional, in part, because it denies the defendant a right to confrontation and cross-examination of the witness. While the introduction of the videotape was error, under the facts of this case, Clark was clearly afforded the right to confront and cross-examine the victim.

Furthermore, under the unique facts of this case, the videotape provided the basis for Clark's main attack on the victim's testimony. Specifically, Clark's jury argument stressed there were "glaring incon-

sistencies" between the videotape testimony and direct testimony offered at trial. In the videotape statement, the victim testified he was forced to suck Clark's penis. However, in his testimony at trial, the victim denied that Clark did anything else to him with his "weiner." Clark also pointed out one other inconsistency between the videotape testimony and the victim's testimony at trial: different people were present earlier in the evening before the attack. In essence, the videotape provided Clark with his most powerful weapon in attacking the victim's credibility.

Second, there is other substantial evidence to support the conviction and punishment. The victim's aunt and mother both testified, without objection, about the victim's outcries, immediately after the assault, that Clark had sexually abused him. Additionally, their physical examination of the victim's body followed each outcry. Both examinations resulted in testimony that the victim's anal area was red, puffed, and swollen. This evidence did not rely on the videotape and was powerful evidence of Clark's guilt.

Furthermore, only a few hours after the offense occurred, Clark expressed strong sexual urges. According to the victim's mother, Clark said he would go "crazy" if his sexual desires were not quickly gratified. Clark's sister, Jo Ann, verified this statement.

Third, the evidence defeating Clark's alibi defense added persuasive force to the State's evidence. Clark attempted to show he was not present when the sexual assault occurred, but was actually en route to or in Mineral Wells. This testimony was initially offered by his sister, who said that Clark left the duplex between 11:00 p.m. and 12:00 a.m., stating he was going to Mineral Wells. However, the principal witness in support of this alibi was Raymond Poole. While all the evidence demonstrated the attack was on Friday night, Poole was certain the trip began on Saturday night and ended on Sunday night. Frederick Branch testified he believed the trip did not occur in late April when the attack occurred, but took place in mid-April.

Fourth, Clark's own witness confirmed that the victim both knew Clark well and was able to identify him. This testimony from Clark's sister, Jo Ann, tended to support the victim's unequivocal identification of Clark.

Fifth, and more importantly, Clark's sister testified Clark was the only adult male in the duplex on the night of the attack. Therefore, any argument that some other person committed the offense was destined to fall on deaf ears.

In making the harmless error analysis under TEX.R.APP.P. 81(b)(2), the court is always faced with a difficult determination when a maximum sentence is imposed. However, the persuasive facts of this case, other than the videotape, mandate that we find the error in admitting the videotape was harmless beyond a reasonable doubt. Additionally, the evidence at the punishment phase of the trial indicates Clark had two prior felony convictions, all committed before he was twenty-four years of age. Therefore, it stretches the imagination to believe the videotape contributed to the sentence of life imprisonment. Interestingly, the videotape actually gave the defendant his only ammunition to use against the victim.

■ We next turn our attention to the parole and good time instructions given by the trial judge. There is no doubt these instructions were error, because the Texas Court of Criminal Appeals subsequently found article 37.07 to be unconstitutional. *Rose*, 752 S.W.2d at 535–37. However, we must now determine whether that error was harmless beyond a reasonable doubt.

In making this determination, we would ordinarily be guided by the Court of Criminal Appeals' opinion in *Rose II.* However, there was no clear majority in that opinion, but merely a plurality of views. Nonetheless, it is obvious the Court of Criminal Appeals considered a number of factors to be important in the harm analysis. Those

factors include: (1) the sentence imposed to the range of punishment; (2) the aggravating or extenuating facts of the case; (3) the defendant's prior criminal record; (4) the court's charge on punishment; and arguably, (5) the final arguments mentioning the effects of parole. *Rose*, 752 S.W.2d at 554.

Additionally, the court emphasized that we must apply a rebuttable presumption that the jury followed any curative instructions given by the trial judge. *Id.* citing *Cobarrubio v. State*, 675 S.W.2d 749, 752 (Tex.Crim.App.1983).

Clark was assessed the maximum punishment under law. However, the facts of the case are particularly troublesome. The seven-year-old victim was entrusted to the care of the adults in the duplex. Clark, one of the adults, was the cousin of the victim. The evidence demonstrated Clark forced himself on the young victim in a small duplex occupied by at least one other adult and two minors.

Additionally, the jury was informed about Clark's prior criminal record, including two prior felony convictions by the time he reached twenty-four years of age. These felony convictions coupled with the aggravated nature of Clark's crime resulted in the imposition of a lengthy sentence.

The court's charge on punishment included the good time and parole law instruction. However, the court's last instruction to the jury on parole and good time law included the curative instruction mandated by article 37.07. That instruction, quoted above, directs the jury not to consider how good conduct time or parole might be applied to Clark. In *Rose II*, the Court of Criminal Appeals held that we must apply a rebuttable presumption that the jury followed any curative instruction given by the

trial judge. *Rose*, 752 S.W.2d at 554. Although the instruction given in *Rose* contained an additional curative instruction which was not given in the instant case, at least one sister court of appeals has applied the rebuttable presumption to the same curative instruction given here. *Montgomery v. State*, 760 S.W.2d 323, 326 (Tex.App. —Dallas 1988, no pet.). There is no evidence before us which tends to rebut the presumption other than the maximum sentence assessed by the jury.

For example, only the State referred to the good time and parole law instruction. Specifically, the State asked that the jury not consider the good time or parole law instruction, but simply assess the life imprisonment punishment which the State argued Clark deserved.

Given the aggravated circumstances surrounding sexual abuse of a seven-year-old child, the overwhelming evidence of guilt, Clark's two previous felony convictions, the curative instruction and the arguments of counsel, we conclude the error in instructing the jury on the law of good time and parole did not, beyond a reasonable doubt, contribute to the punishment assessed by the jury.

As we have found there was no harm beyond a reasonable doubt, we affirm the judgment of the trial court.