In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00099-CR


______________________________




ROGER LEE CARLOCK, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 76th Judicial District Court


Camp County, Texas


Trial Court No. CF-01-7259




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Justice Ross



O P I N I O N



 Roger Lee Carlock was charged with indecency with a child. He pled not guilty and
not true to two paragraphs alleged for enhancement of punishment. A jury found him guilty
of the offense charged and also found the two enhancement paragraphs true. He was
sentenced, in accordance with the jury's verdict, to ninety-nine years' imprisonment and
a $10,000.00 fine. 

 Carlock alleges the trial court erred: 1) by denying his request to make an opening
statement after the State read the indictment in front of the jury, thereby presenting the
equivalent of an opening statement; 2) in admitting a videotaped interview of the child,
because the statements given by the child were in response to questions calculated to elicit
those responses; and 3) in admitting two prior judgments of conviction for the jury to
consider in assessing his punishment.

 The State read the indictment against Carlock in front of the jury before calling its
first witness. The State then announced it would not be making an opening statement. 
Carlock requested an opportunity to make an opening statement before the State began
its case, contending the State had made an opening statement when it read the indictment
before the jury. The trial court denied the request. Carlock contends this was error.

 Article 36.01(b) of the Texas Code of Criminal Procedure allows a defendant to
make an opening statement immediately after the attorney representing the state makes
an opening statement. (1) Tex. Code Crim. Proc. Ann. art. 36.01(b) (Vernon Supp. 2003). 
However, Article 36.01(b) is inapplicable when the state waives its opening statement. 
Moore v. State, 868 S.W.2d 787, 790-91 (Tex. Crim. App. 1993). In the cases where the
state waives its opening statement, the defendant may make his or her opening statement
on the close of the state's case-in-chief. Id. at 791. 

 Carlock contends the State made the equivalent of an opening statement in this
case when it read the indictment in front of the jury. This Court has been faced with this
argument in the past. Parra v. State, 935 S.W.2d 862, 871 (Tex. App.-Texarkana 1996,
no pet.). In that case, we recognized that the reading of the indictment is required under
Article 36.01(a)(1) of the Texas Code of Criminal Procedure. Id.; see Tex. Code Crim.
Proc. Ann. art. 36.01(a)(1) (Vernon Supp. 2003). We reasoned that, if reading the
indictment under Article 36.01(a)(1) constituted an opening statement, then there would
be no need for Article 36.01(a)(3). Id.; see Tex. Code Crim. Proc. Ann. art. 36.01(a)(3)
(Vernon Supp. 2003). Therefore, the reading of an indictment does not constitute an
opening statement by the state. Because it is not an opening statement, Article 36.01(b)
is inapplicable to this case and Carlock was limited to making his opening statement after
the State's case-in-chief. His first point of error is overruled. As his second point of error, Carlock contends the videotaped interview of the child
should not have been admitted into evidence because the statements given by the child
were in response to questions calculated to elicit those responses. 

 Carlock was accused of touching the genitals of an eight-year-old male child. A
videotaped interview with the child was played for the jury, along with testimony from Kathy
Smedley, the program director of the Northeast Texas Child Advocacy Center, who
conducted the interview. In addition to the videotaped interview, the child testified in
person at the trial.

 During the videotaped interview, when asked about "who touches you or tries to see
private places," the child answered "Only one person that does it . . . [t]hat's Robert." 
Smedley responded to the name "Robert" by saying, "Huh?," and is told again, "Robert." 
Smedley questions, "Robert?" and the child responds, "Uh-huh." Although the child does
not go into great detail about how he knew the person who was touching him, it appears
the person lived down the street from the child. 

 Later in the interview, the child said the name "Roger." The first mention of that
name was when the child said, "we saw a black car coming up, looking for Roger." The
child does not continue his story about the black car because he was interrupted by
Smedley, who asked, "Is it Roger or Robert?" When the child answers, "Roger," Smedley
asked if she got it wrong when she wrote Robert and changed her earlier notes about who
had touched the child from "Robert" to "Roger." On cross-examination and in closing
argument, Carlock questioned and focused on these inconsistencies. But, as mentioned
earlier, the child testified in person at trial; there, the child only said the name "Roger" and
even pointed to Carlock as the person who had touched him.

 Article 38.071 of the Texas Code of Criminal Procedure provides that the recording
of an oral statement by a child who is younger than thirteen and a victim of certain
offenses, including indecency with a child, is admissible in evidence so long as certain
prerequisites are met, one of which is the statement was not made "in response to
questioning calculated to lead the child to make a particular statement." Tex. Code Crim.
Proc. Ann. art. 38.071, § 5(a)(4) (Vernon Supp. 2003). In the past, we have construed this
language as invalidating the videotape only if, taken as a whole, the statement is the
product of leading questions. Mallory v. State, 699 S.W.2d 946, 951 (Tex.
App.-Texarkana 1985), rev'd & remanded on other grounds, 752 S.W.2d 566 (Tex. Crim.
App. 1988). Leading questions that are isolated, or those concerning the details of
testimony already given in response to proper interrogation, or those concerning matters
not directly relating to the offense, will not destroy the videotape's admissibility so long as
the overall product is not the result of suggestion. Id. 

 From our review of the videotape, we agree Smedley should not have been so quick
to switch the child's focus away from the name "Robert" on his first mention of the name
"Roger." Smedley admitted on cross-examination it was possible she was listening for the
name "Roger" in the interview. We do not know what the child intended to say after he
brought up the name "Roger," because Smedley then immediately launched into
questioning the child about whether he was saying "Roger," not "Robert." Smedley
ultimately concluded she misunderstood the child earlier in the interview when he said
Robert had touched him. However, for the remainder of the interview most of Smedley's
questions about what happened to the child are phrased along the lines of what did "he"
do to you. She only uses the name Roger twice in the remainder of her questioning. We
do not find the videotape, taken as a whole, was the result of suggestion. 

 Carlock also contends the admission of the videotape bolstered the testimony of the
victim. We disagree. Instead of bolstering the victim's testimony, this videotape tended
to impeach it. The child, when asked on the videotape, "who touches you or tries to see
private places," answered, "Only one person that does it . . . [t]hat's Robert." Carlock's
counsel used the child's inconsistencies on the videotape in his closing argument to the
jury. He repeated the name, "Robert, Robert, Robert, Robert, Robert" as he pointed out
the inconsistencies in the victim's story. 

 Even an erroneous admission of a videotape can be harmless when the videotape
provides a defendant's "main attack" against the victim's testimony. Clark v. State, 781
S.W.2d 954, 958-59 (Tex. App.-Fort Worth 1989, no pet.). Therefore, even if the
admission of the videotape in this case were error, it was harmless because it provided
Carlock with his main attack against the victim's testimony in court. Carlock's second point
of error is overruled. 

 As his third point of error, Carlock contends the trial court erred in admitting into
evidence two uncertified copies of judgments of conviction against him. The judgments
were purportedly for the same convictions alleged in the indictment for enhancement of
punishment, and the State introduced such judgments through its witness, Kathy Worth,
who had served as Carlock's parole officer. The following testimony shows the context in
which these documents were received into evidence:

 Q (BY MR. BAILEY) [State's counsel]: Ms. Worth, let me show
you State's Exhibit 2 and State's Exhibit 3.


 A Yes, sir.


 Q Okay. Are those the two cases that you supervised the defendant, Roger Carlock, on?


 A Yes, sir, they are.


 Q Okay, and he's the same person that's present here in court 
today; is that correct?


 A That's correct.


 Q The State would offer State's Exhibit[s] 2 and 3.


 . . . .


 THE COURT: If you want to examine the documents.


 MR. COLLEY [Defense Counsel]: Yes, sir.


 Judge, I'm going to object. She's not supervising him. She's
not going to be able to testify that those are the judgments that were entered
on a certain day and that they apply to this.


 THE COURT: It's overruled. They're admitted.


 . . . .


 Q (BY MR. BAILEY) You mentioned - before I gave you those papers
- that you supervised him for indecency with a child in one case and sexual
assault in the other; is that correct?


 A Yes, sir.


 Q Okay, and you're familiar with what he was convicted of and what you were to supervise him for. That's part of your job; is that correct?


 A Yes, sir, it is.


 Q And you, in performing your job duties, check information about
him as far as his convictions - and that, I believe, is even sent to you from
the penitentiary - in your effort to supervise someone; is that correct?


 A Yes. 


 Q So, you've seen other copies of those documents in your own
files; is that correct?


 A Yes, sir, I have.


 In Bautista, the defendant complained of the use of a parole officer to prove the
enhancements used against him, urging that this method was not one of the accepted
methods of proving enhancements. Bautista v. State, 642 S.W.2d 233, 236 (Tex.
App.-Houston [14th Dist.] 1982, pet. ref'd, untimely filed). The defendant pointed to the
following as a list of approved methods: 1) testimony of a witness who personally knows
the defendant and the fact of his prior conviction and identifies him; 2) stipulation or judicial
admission of the defendant that he has been so convicted; 3) introduction of certified
copies of the judgment, sentence, and record of the Texas Department of Corrections or
a county jail, including fingerprints of the accused, supported by expert testimony
identifying them with known prints of the defendant; 4) comparison by the fact-finder of a
record of conviction, which contains photographs and a detailed physical description of the
named person, with the appearance of the defendant present in court. Id. at 236-37. 

 In Bautista, the defendant argued that using a parole officer was not an approved
method of proving a defendant's prior criminal convictions because the parole officer's
testimony was insufficient evidence to establish the defendant was the same person
named in and present in court on the dates mentioned in the certified copies of the two
judgments. Id. The court, while acknowledging the four methods cited by Bautista,
concluded the list was not exhaustive, but also decided the testimony of the parole officer
satisfied the first suggested method, "Testimony of a witness who personally knows the
defendant and the fact of his prior conviction and identifies him." Id. The court points out
there would be no self-serving reason for the defendant to admit himself or herself to
parole under the previous cases unless he or she was the convicted defendant thereunder.
 Id. at 237.

 In this case, Carlock distinguishes Bautista because in that case the parole officer
testified using certified copies of the judgments against the defendant, whereas in this case
copies of the judgments were admitted into evidence that were not certified. Carlock
contends the "appropriate" method to introduce the prior judgments was to obtain certified
copies and offer those judgments under Texas Rule of Evidence 902(4) as certified public
records. (2) Rule 902 describes documents that are self-authenticating, and Carlock's
suggested method is certainly the traditional method of introducing a prior judgment. 
However, if a document is not self-authenticated under Rule 902, it still can be
authenticated under Rule 901. (3) 

 Rule 901(b)(7) illustrates how to authenticate public records and reports. Tex. R.
Evid. 901(b)(7). To authenticate a public record which is authorized by law to be recorded
or filed in a public office, the testifying witness must be able to provide evidence that the
writing is from the public office that keeps that type of record. Id. Carlock contends the
parole officer could not authenticate the judgments because she was not the custodian of
those records and therefore could not authenticate the judgments by "mere testimony that
he or she once supervised a Defendant on parole." Carlock is correct. The parole officer
was able to testify she was familiar with the defendant and his previous criminal record;
however, her testimony was not sufficient to authenticate the two judgments because she
was unable to provide the necessary proof that those two judgments were from the public
office responsible for maintaining those records. Because the judgments were not certified
copies, authentication was required and the parole officer's testimony was not enough. 

 The State contends any complaint regarding the introduction of Carlock's prior
convictions was waived because Carlock's own witnesses testified about Carlock having
prior convictions. On cross-examination, Carlock's sister acknowledged she knew Carlock
had been to the penitentiary twice. Another witness, Jeanetta Heath, testified on cross-examination she knew Carlock had been convicted of sex offenses before. The State
emphasizes Carlock asked one witness, Phillip Hawkins, about the prior convictions on
direct examination and contends this constituted waiver under Ex parte Girnus, 640
S.W.2d 619 (Tex. Crim. App. 1982). 

 In Girnus, the court's holding was contingent on the defendant taking the stand at
the guilt/innocence stage of the trial. Id. at 620. The court concluded that, if the defendant
takes the stand and any part of his or her prior criminal record is properly used for
impeachment, the same need not be reintroduced at the trial on punishment and such
evidence may be properly considered by the judge or jury assessing the penalty. Id. at
620-21. The facts of this case are distinguishable from Girnus because Carlock did not
testify. Moreover, the testimony given by the witnesses who testified on Carlock's behalf
acknowledged his prior convictions only in general terms. The most specific reference
involved the question posed to Carlock's sister, which did mention the year of two
convictions. However, no one referred to cause numbers or any other specifics of
Carlock's prior convictions alleged in the indictment and which the State was required to
prove. Carlock did not waive this argument.

 It was error for the trial court to admit the two uncertified copies of the judgments
because the testimony of the parole officer was insufficient to authenticate the documents
under Rule 901. See Tex. R. Evid. 901. This error was obviously harmful to Carlock. The
jury assessed punishment at ninety-nine years' imprisonment, which was only permissible
because of the enhancements. Therefore, Carlock's third point of error is sustained.

 We affirm the conviction, but reverse the punishment and remand the case for a
new trial on punishment.



 Donald R. Ross

 Justice



 

Date Submitted: January 15, 2003

Date Decided: February 5, 2003


Publish

1. Art. 36.01. Order of proceeding in trial


 (a) A jury being impaneled in any criminal action, except as provided
by Subsection (b) of this article, the cause shall proceed in the following
order:


 1. The indictment or information shall be read to the jury by the
attorney prosecuting. When prior convictions are alleged for purposes of
enhancement only and are not jurisdictional, that portion of the indictment or
information reciting such convictions shall not be read until the hearing on
punishment is held as provided in Article 37.07.


 . . . .



 3. The State's attorney shall state to the jury the nature of the
accusation and the facts which are expected to be proved by the State in
support thereof.


 . . . .



 (b) The defendant's counsel may make the opening statement for the
defendant immediately after the attorney representing the State makes the
opening statement for the State. After the defendant's attorney concludes
the defendant's opening statement, the State's testimony shall be offered. 
At the conclusion of the presentation of the State's testimony, the
defendant's testimony shall be offered, and the order of proceedings shall
continue in the manner described by Subsection (a) of this article.


Tex. Code Crim. Proc. Ann. art. 36.01 (Vernon Supp. 2003).

 
2. Tex. R. Evid. 902 provides:

 RULE 902. SELF-AUTHENTICATION 


 Extrinsic evidence of authenticity as a condition precedent to
admissibility is not required with respect to the following: 

 

 . . . .

 
 (4) Certified Copies of Public Records. A copy of an official record
or report or entry therein, or of a document authorized by law to be recorded
or filed and actually recorded or filed in a public office, including data
compilations in any form certified as correct by the custodian or other person
authorized to make the certification, by certificate complying with paragraph
(1), (2) or (3) of this rule or complying with any statute or other rule
prescribed pursuant to statutory authority. 
3. Tex. R. Evid. 901 provides:
 RULE 901. REQUIREMENT OF AUTHENTICATION OR IDENTIFICATION 

 (a) General Provision. The requirement of authentication or
identification as a condition precedent to admissibility is satisfied by evidence
sufficient to support a finding that the matter in question is what its proponent
claims. 

 (b) Illustrations. By way of illustration only, and not by way of
limitation, the following are examples of authentication or identification
conforming with the requirements of this rule: 

 . . . .

 
 (7) Public records or reports. Evidence that a writing authorized by
law to be recorded or filed and in fact recorded or filed in a public office, or
a purported public record, report, statement, or data compilation, in any form,
is from the public office where items of this nature are kept. 



HREF="#N_4_"> (4) was passed permitting oral examination of the parties. Apparently that
procedure was in place until 1897 when "some lawyer, evidently having a case which necessitated
a change for his convenience," authored a bill preventing the taking of depositions "ex parte" when
a corporation was a party to the suit. So in 1923, the Legislature enacted Article 2002, which allowed
the trial courts to issue bills of discovery and grant relief in accordance with the usages of courts of
equity. Id. 

 Article 2002 remained in our law until the "new" Rules of Civil Procedure were enacted in
1941, at which time Article 2002 was repealed and Rule 737 incorporated its terms. Repealed by
Rules of Civil Procedure (Acts 1939, 46th Leg., p. 201, § 1). Finally, in 1999, the rules regarding
discovery were substantially changed and Rule 737 was replaced and limited by Rule 202. Tex. R.
Civ. P. 737, repealed by Order of Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999; see Nathan L.
Hecht & Robert H. Pemberton, A Guide to the 1999 Texas Discovery Rules Revisions
(1998), http://adrr.com/law1/rules.htm.

 So the rule now containing vestiges of the bill of discovery has been incorporated into Rule
202. Neither that rule, nor any other procedural rule, was used in this proceeding. Does the trial court
still retain authority to issue such a discovery order by virtue of the common law equitable bill of
discovery? We think not. 

 Prior to the enactment of any statute or rule authorizing a bill of discovery, the Texas Supreme
Court addressed the issue in Cargill & Dennis v. Kountze Bros., 86 Tex. 386, 25 S.W. 13 (1894). The
court stated: "If the courts of equity in England ever entertained bills of discovery of this character,
and if the jurisdiction became incorporated into our system of jurisprudence by the adoption of the
common law, we are still of opinion that it is no longer the law of this State." Id. at 400. As
mentioned earlier, the Legislature enacted a law in 1923 specifically allowing a bill of discovery. 
After the passage of the bill of discovery statute, an opinion dealt again with this issue. Chapman v.
Leaverton, 263 S.W. 1083 (Tex. Civ. App.--Fort Worth 1924, writ ref'd) (motion for rehearing
overruled combined with a number of other cases at 269 S.W. 1024, 1029 (Tex. 1925)). In Chapman,
the court held that the Legislature's act of reviving the bill of discovery "intended to confer some
additional remedy in favor of the plaintiff or the judgment creditor, in order that he might discover
facts which would be advantageous to him in the furtherance of his cause of action or in the collection
of his judgment." Id. at 1086. In denying the writ of error, the Texas Supreme Court agreed that the
Fort Worth Court of Civil Appeals had "correctly construed" the bill of discovery statute. 269 S.W.
at 1069. This interpretation was followed in Dallas Joint Stock Land Bank v. State ex rel. Cobb, 135
Tex. 25, 137 S.W.2d 993 (1940), and Hastings Oil Co. v. Tex. Co., 149 Tex. 416, 234 S.W.2d 389
(1950). 

 These events demonstrate that in 1894 the Texas Supreme Court declared that the
jurisprudence of the State of Texas did not include a common law equitable bill of discovery. Since
that time, the bill of discovery has been available only by statutory or rule authorization. No such
general bill of discovery statute or rule now exists; instead, the discovery process in Texas is now
thoroughly controlled by specific rules. Based on these authorities, even if the order in this case could
be considered one pursuant to a motion for a bill of discovery, we find that the trial court did not have
authority to grant such a discovery order other than as sanctioned and regulated by the Texas rules
for discovery. 

 A trial court does, of course, have inherent power to facilitate litigation of lawsuits and
prevent abuse of process--although that is partially promoted by, and partially guided by, the Texas
Rules of Civil Procedure. Waguespack v. Halipoto, 633 S.W.2d 628, 629 (Tex. App.--Houston [14th
Dist.] 1982, writ dism'd w.o.j.). Thus, between the court's "inherent power" and the applicable rules
of procedure and evidence, judges have broad, but not unfettered, discretion in handling trials. 
Metzger v. Sebek, 892 S.W.2d 20, 38-39 (Tex. App.--Houston [1st Dist.] 1994, writ denied). (5) 

 In jurisdictional contexts, the Texas Supreme Court has consistently held that trial courts have
only

 such powers and jurisdiction as are directly provided by law, and, in addition thereto,
they have such further powers and jurisdiction as are reasonably proper and
necessary,-that is, as ought to be inferred, from the powers and jurisdiction directly
granted. 


Ex parte Hughes, 133 Tex. 505, 129 S.W.2d 270, 273-74 (1939).

 In the context of procedural rules involving discovery, the Texas Supreme Court has similarly

 held to the doctrine that Texas courts have no inherent powers, either at law or in
equity, not even to originate new process to enable parties to secure evidence in
support of their cases. . . . So if the trial court had authority to issue the order
complained of it must be found in the written law or it must arise by reasonably
necessary implication therefrom. 


Hastings Oil Co. v. Tex. Co., 149 Tex. 416, 234 S.W.2d 389, 393 (1950) (cited with approval in Pope
v. Ferguson, 445 S.W.2d 950, 952 (Tex. 1969)). (6)

 An extensive system is in place governing procedures applicable to this situation; in the
absence of some extraordinary reason to depart from those procedures, trial courts do not have the
inherent authority to create their own ad hoc procedures. 

 C. The Texas Discovery Rules 

 Texas discovery rules provide a mechanism for an orderly process of discovery which was not
utilized in this case. One relevant portion of the rule governing discovery from nonparties is Tex. R.
Civ. P. 205.1(c), (d), which authorizes discovery from a nonparty by serving a subpoena compelling
production of documents and tangible things under the rule. That rule also allows a party to compel
discovery from a nonparty by obtaining a court order under Tex. R. Civ. P. 196.7, 202, or 204. (7)

 Another source of authority is Tex. R. Civ. P. 205.3, which provides that a party may compel
production from a nonparty by serving notice and a subpoena compelling production or inspection. 
Rule 205.3(d) provides that the nonparty must respond to the notice and subpoena in accordance with
Tex. R. Civ. P. 176.6. Rule 176.6(d) provides a procedure for objecting effectively to the issuance
of discovery orders under 176.6(c) (referencing Rule 193.7). Subsection (d) states that the nonparty
may object and withhold material claimed to be privileged. Under some circumstances, Rule 176.6(e)
further allows counsel to seek a protective order under the procedures set out in Tex. R. Civ. P. 192.6. 

 There is also a specific section specifying how hearings are to be noticed, heard, and
conducted on objections and assertions of privilege. Tex. R. Civ. P. 193.4. (8) 

 Similarly, under Tex. R. Civ. P. 199.2(b)(5), which sets out procedures for noticing oral
depositions, if the witness is a nonparty, the request must comply with Tex. R. Civ. P. 205, and the
nonparty's response to the request is governed by Tex. R. Civ. P. 176 and 205.

 Rule 202, which supplanted the former Rule 737 relating to a bill of discovery, allows the
taking of a deposition to investigate a potential claim or suit. Tex. R. Civ. P. 202.1(b). 

 The result is this: An order compelling production could have been issued pursuant to the
rules of procedure. The mechanisms set out in the rules of discovery that might authorize and
regulate such an order (and also the protections to the person inherent in those procedures) were not
utilized. Instead, counsel sought and originally obtained an ex parte order entirely outside the rules,
based on the application of a statute that is not relevant to this situation. By not attempting to follow
any rules regarding discovery, the parties and the court were operating without rules concerning such
matters as when objections or privileges should be raised, when evidence must be submitted, when
and if a protective order was available, and many other matters. Finally, when no rules are employed,
it is impossible to adequately review the propriety of the actions taken by the parties and the court. 
 D. Conclusion

 Texas rules provide a comprehensive procedure for seeking discovery. They were not used,
over direct complaint by counsel for Doe 1. We have found no other procedural basis for a trial court
to issue such a discovery order.

 A trial court's ruling that requires production beyond what our procedural rules permit is an
abuse of discretion. In re Dana Corp., 138 S.W.3d 298, 301 (Tex. 2004); see, e.g., Texaco, Inc. v.
Sanderson, 898 S.W.2d 813, 815 (Tex. 1995) (orig. proceeding). Similarly, a writ may issue where
the trial court's order improperly restricts the scope of discovery defined by the Texas Rules of Civil
Procedure. Lindsey v. O'Neill, 689 S.W.2d 400, 401 (Tex. 1985). 

 We conclude that, when a discovery order entirely fails to apply the rules of discovery,
issuance of mandamus requiring the trial court to utilize those rules and procedures is appropriate. (9) 

 Because of the unusual posture of this case, and because of the dearth of Texas authority on
this subject, we will attempt to provide some guidance for the trial court in applying the rules of
discovery in light of the types of constitutionally-based objections that have already been raised to
the discovery, should this matter be presented again in this cause. 

V. Constitutional Requirements for Ordering the Disclosure of Anonymous Internet
Authors


 A. First Amendment Protection 

 The First Amendment protects anonymous speech. See Buckley v. Am. Constitutional Law
Found., 525 U.S. 182, 199-200 (1999). The Supreme Court has noted that "[a]nonymity is a shield
from the tyranny of the majority." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 356 (1995).
Indeed, "[u]nder our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice,
but an honorable tradition of advocacy and of dissent." Id.

 First, an author's decision to remain anonymous, like other decisions concerning omissions
or additions to the content of a publication, is an aspect of the freedom of speech protected by the
First Amendment. McIntyre, 514 U.S. at 342.

 Second, the protections of the First Amendment extend to the Internet. See Reno v. ACLU,
521 U.S. 844, 870 (1997). "Courts have recognized the Internet as a valuable forum for robust
exchange and debate." Sony Music Entm't, Inc. v. Does 1-40, 326 F.Supp.2d 556, 562 (S.D.N.Y.
2004); Best W. Int'l v. Doe, No. CV-06-1537-PHX-DGC, 2006 WL 2091695 (D. Ariz. July 25, 2006,
order). 

 Speech over the Internet is afforded no lower level of First Amendment scrutiny. Reno, 521
U.S. at 870. Indeed, the Supreme Court has characterized Internet speech by the same terms as
traditional political speech: "Through the use of chat rooms, any person with a phone line can
become a town crier with a voice that resonates farther than it could from any soapbox. Through the
use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." 
Id. at 870; see also Doe v. Cahill, 884 A.2d 451, 456 (Del. 2005) ("Anonymous internet speech in
blogs or chat rooms in some instances can become the modern equivalent of political
pamphleteering."). (10)

 Several courts have noted that Internet anonymity serves a particularly vital role in the
exchange of ideas and robust debate on matters of public concern. See, e.g., Doe v. 2themart.com
Inc., 140 F.Supp.2d 1088, 1092-93 (W.D. Wash. 2001) (Internet exchange of ideas "driven in large
part by the ability of Internet users to communicate anonymously"); Columbia Ins. Co. v.
Seescandy.com, 185 F.R.D. 573, 578 (N.D. Cal. 1999). The protection of Internet speech also
includes the protection of anonymous electronic speech. See, e.g., 2themart.com Inc., 140 F.Supp.2d
at 1092 ("The right to speak anonymously extends to speech via the Internet."). 


 B. Limitations on the Right of Free Speech 

 The First Amendment is not intended to protect unconditionally all forms of expression. See
Beauharnais v. Illinois, 343 U.S. 250, 266 (1952) (libelous statements are outside the realm of
constitutionally protected speech). The right to speak anonymously is therefore not absolute.
However, this right would be of little practical value if there was no concomitant right to remain
anonymous after the speech is concluded. 2themart.com Inc., 140 F.Supp.2d at 1093. Those who
suffer damages as a result of tortious or other actionable communications on the Internet are clearly
able to seek a remedy. Therefore, while the anonymous subscribers in this case have a First
Amendment right to anonymous speech on the Internet, that right is subject to limitation. Polito v.
AOL Time Warner, Inc., No. 03CV3218, 2004 Pa. Dist. & Cnty. Dec. LEXIS 340 (Pa. D. & C.
Jan. 28, 2004). The courts must balance the right to communicate anonymously with the right to hold
accountable those who engage in communications that are not protected by the First Amendment. 
Thus, although the right to speak anonymously "would be of little practical value if . . . there was no
concomitant right to remain anonymous" in the face of a civil action subpoena, a civil litigant has an
interest in asserting his or her rights through the litigation process against an anonymous tortfeasor. 
Id.; see Cahill, 884 A.2d at 456. As in other venues, therefore, anonymous (electronic) speakers may
not freely defame individuals without facing civil responsibility for their acts. McMann v. Doe, 460
F.Supp.2d 259, 263 (D. Mass. 2006).

 There are no cases in Texas directly on point. This is, however, far from the first court to be
confronted with this problem. The common threads among the various jurisdictions involve available
means for discovery and the proper application of that means when confronted with a constitutional
right that otherwise prevents the information from being obtained. Thus, the question is: When does
a plaintiff have a right to discover the identity of the writer in light of the constitutional right to
anonymous free speech? 

 As noted by a number of the cases referenced in this opinion, the chilling effect on the First
Amendment right of free speech that results from making such "confidential" information too easily
accessible is apparent. (11) The cases spend a considerable--and appropriate--amount of time
discussing the national interest in not inappropriately restricting the free flow of thought and
discussion by unsupported threats of litigation. However, they also acknowledge that the anonymity
of the blogger can be overcome under certain circumstances.

 To that extent, the cases are in accord. The point of departure is in determining exactly how
much and what kind of proof of libel or defamation is enough to justify cutting though the
constitutional protection to allow the identification of the anonymous contributors. 


 C. Quantum of Proof Required

 The cases that have decided this issue range from placing an extremely light burden (indeed,
virtually no burden at all) on the plaintiff, to requiring the plaintiff to tender proof of its allegations
that would survive a summary judgment, or even more stringent requirements. At least one case has
essentially concluded that the mere allegation of libel is sufficient. Alvis Coatings, Inc. v. John Does
One Through Ten, No. 3:04CV374-H, 2004 U.S. Dist. LEXIS 30099 (W.D.N.C. Dec. 2, 2004). Other
cases have articulated requirements that are so weak as to essentially require no more than allegations
made in good faith (or not in bad faith), with some evidence to support the allegations. See Polito,
2004 Pa. Dist. & Cnty. Dec. LEXIS 340.

 We cannot agree that either of these formulations is sufficient to survive any form of
constitutional balancing. Thus, the question becomes the degree of actual proof that must be provided
before the balance tips in favor of piercing the constitutional shield and disclosing the identity of the
anonymous blogger. 

 We find ourselves more in alignment with the formulations set out in Cahill, 884 A.2d at
458-61. See extensive discussion about the application of this standard in Best W. Int'l, 2006 WL
2091695. The court in Cahill described the test as: "[B]efore a defamation plaintiff can obtain the
identity of an anonymous defendant through the compulsory discovery process he must support his
defamation claim with facts sufficient to defeat a summary judgment motion." Cahill, 884 A.2d at
460. This standard does not require a plaintiff to prove its case as a matter of undisputed fact, but
instead to produce evidence sufficient to create issues that would preclude summary judgment. 

 As correctly noted in Best Western, other courts have recognized a range of possible
showings--"ranging (in ascending order) from a good faith basis to assert a claim, to pleading
sufficient facts to survive a motion to dismiss, to a showing of prima facie evidence sufficient to
withstand a motion for summary judgment and, beyond that, hurdles even more stringent." Best W.
Int'l, 2006 WL 2091695, at *4; see Cahill, 884 A.2d at 457. 

 The Arizona court recognized that the conduct was purely expressive--where in Polito a type
of harassment was involved--and that the Does were expressing "their views on issues of interest to
BWI members and governors in a forum specifically designed for an exchange of opinions and ideas
anonymously." The court concluded that such speech is entitled to substantial First Amendment
protection.

 The district court imposed a summary judgment standard before discovery was available to
discover the identities of the John Doe defendants. As described, the standard does not require a
plaintiff to prove its case as a matter of undisputed fact, but instead to produce evidence sufficient to
establish the plaintiff's prima facie case.

 The court opined, citing Cahill:

 [T]o obtain discovery of an anonymous defendant's identity under the summary
judgment standard, a defamation plaintiff must submit sufficient evidence to establish
a prima facie case for each essential element of the claim in question. In other words,
the defamation plaintiff, as the party bearing the burden of proof at trial, must
introduce evidence creating a genuine issue of material fact for all elements of a
defamation claim within plaintiff's control.

Best W. Int'l, 2006 WL 2091695; Cahill, 884 A.2d at 465. (12) 

 The court noted that, because pleading standards are so lenient, it could not conclude that the
complaint was asserted in bad faith, or that it would likely be subject to a motion to dismiss. 

 Thus, if the standard for permitting discovery of the John Doe Defendants' identities
required only good faith or the ability to survive a motion to dismiss, BWI's proposed
discovery would be permitted and the Defendants' First Amendment right to
anonymous speech would be defeated. A good faith allegation of wrongdoing, devoid
of factual detail, would suffice.


Best W. Int'l, 2006 WL 2091695.


 The court held that:

 [M]ore is needed before a defendant's First Amendment rights may be eliminated. 
The Court must examine facts and evidence before concluding that a defendant's
constitutional rights must surrender to a plaintiff's discovery needs. The summary
judgment standard will ensure that the Court receives such facts and evidence.

 

Id.

 We agree with this analysis. (13) The Hospital has made several claims based not only on
defamation, but also business disparagement and other matters. We will not attempt to express an
opinion on the merits of these arguments. We anticipate that, if this matter is again presented to the
trial court, this opinion will provide guidance concerning the procedure to be employed and the
standard for testing the evidence. 

 For the reasons stated, we conditionally grant the writ of mandamus and order the trial court
to vacate its order and proceed in accordance with this opinion. We are confident the trial court will
comply, and our writ will issue only if it does not.


 Jack Carter

 Justice


Date Submitted: October 24, 2007

Date Decided: December 12, 2007

1. The term "blog" is a shorthand version of the word "Weblog." A Weblog is an Internet Web
site that displays in chronological order the postings by one or more individuals and usually has links
to comments on specific postings. American Heritage Dictionary of the English Language
(4th ed. 2006), available at http://dictionary.com.
2. The suit against Does 2-10 is not implicated here; the trial court's order was directed solely
at the ISP, ordering it to reveal the name of Doe 1. In that portion of the lawsuit, the Hospital alleged
that Does 2-10 had improperly revealed patient information by posting on the blog that might, under
the federal act known as HIPAA, make the Hospital civilly liable to those patients or their survivors. 
3. Some examples of discovery disputes in this context include Rocker Mgmt. LLC v. John
Does 1 Through 20, No. MISC 03-003 3 CRB, 2003 U.S. Dist. LEXIS 16277 (N.D. Cal. 2003,
order) (not designated for publication); Virologic, Inc. v. Doe, Nos. A101571, A102811, 2004 Cal.
App. Unpub. LEXIS 8070 (Cal. Ct. App. Sept. 1, 2004) (not designated for publication); La Societe
Metro Cash & Carry France v. Time Warner Cable, No. CV030197400S, 2003 Conn. Super. LEXIS
3302 (Conn. Super. Ct. Dec. 2, 2003) (not designated for publication); John Doe No. 1 v. Cahill, 884
A.2d 451 (Del. 2005) (applying Delaware procedural rules); Dendrite Int'l, Inc. v. Doe, No. 3, 775
A.2d 756 (N.J. Sup. Ct. App. Div. 2001); In re Greenbaum v. Google, Inc., No. 102063/07, 2007
N.Y. Misc. LEXIS 7274 (N.Y. Sup. Ct. Oct. 23, 2007); Klehr Harrison Harvey Branzburg & Ellers,
LLP v. JPA Dev., Inc., No. 0425, 2006 Phila. Ct. Com. Pl. LEXIS 1 (Phila. Ct. Com. Pl. Jan. 4,
2006).

 See Alvis Coatings v. Does 1-10, No. 3:04 CV 374-H, 2004 U.S. Dist. LEXIS 30099(W.D.
N.C. Dec. 2, 2004, order) (relying on Fed. R. Civ. P. 26(b)(1) for discovery mechanism); Doe v.
2themart.com Inc., 140 F.Supp.2d 1088, 1090 (D. Wash. 2001) (subpoena under Fed. R. Civ. P.
45(a)(2)); In re Subpoena Duces Tecum to Am. Online, Inc., No. 40570, 2000 Va. Cir. LEXIS 220
(Va. Cir. Ct. 2000, order), rev'd & remanded on other grounds, 542 S.E.2d 377 (Va. 2001)
("Pursuant to Va. Code § 8.01-411"). 

 See also Arista Records LLC. v. Does 1-19, No. 07-1649 (CKK), 2007 U.S. Dist. LEXIS
78416 (D.D.C. Oct. 11, 2007) (Fed. R. Civ. P. 45); Arista Records LLC v. Does 1-9, No. 07-CV-00628-EWN, 2007 U.S. Dist. LEXIS 25191 (D. Colo. Apr. 4, 2007) (Fed. R. Civ. P. 45); McMann
v. Doe, 460 F.Supp.2d 259, 263, 265 (D. Mass. 2006) (discussing ex parte subpoenas under federal
civil procedure, copyright, and other statutes); UMG Recordings, Inc. v. Does 1-4, No. 06-0652
SBA, 2006 U.S. Dist. LEXIS 32821 (N.D. Cal. Mar. 6, 2006) (Fed. R. Civ. P. 45 and Local Rule 7-11(a)); In re Baxter, No. 01-00026-M, 2001 U.S. Dist. LEXIS 26001(W.D. La. Dec. 19, 2001) (Fed.
R. Civ. P. 27); Apple Computer, Inc. v. Doe 1, No. 1-04-CV-032178, 2005 WL 578641, at *2 (Cal.
Super. Ct. Mar. 11, 2005) (California discovery statute).
4. See 4 H.P.N. Gammel, The Laws of Texas 1822-1897, at 982-83,
http://texashistory.unt.edu/permalink/meta-pth-6730:986. 
5. See Tex. R. Civ. P. 270 (allowing court discretion to permit "additional evidence" to be
offered); Tex. R. Civ. P. 286 (stating that "[a]dditional argument may be allowed in the discretion
of the court" in event jury receives further instructions after having retired); Tex. R. Evid. 611(a)
(giving court "reasonable control" over interrogation of witnesses and presentation of evidence); Tex.
Employers Ins. Ass'n v. Loesch, 538 S.W.2d 435, 440 (Tex. Civ. App.--Waco 1976, writ ref'd n.r.e.)
(holding that court may place some limits on voir dire examination). The trial court's authority to
dismiss for want of prosecution stems from Rule 165a of the Texas Rules of Civil Procedure as well
as the court's inherent power. Villarreal v. San Antonio Truck & Equip., 994 S.W.2d 628, 630 (Tex.
1999). "By rule, statute, and their own inherent power, trial courts have broad authority to sanction
litigants for specific misconduct." In re N.R.C., 94 S.W.3d 799, 807 n.4 (Tex. App.--Houston [14th
Dist.] 2002, pet. denied); see also Onstad v. Wright, 54 S.W.3d 799, 804 (Tex. App.--Texarkana
2001, pet. denied). 
6. "Whatever may be the powers of courts of other States, there can be no doubt that the courts
of Texas must look to the Constitution of this State, the enactments of the Legislature, and the
common law, for their authority to proceed as requested in this case [to require an injured plaintiff
to submit to a physical examination], and, if the authority did not exist at common law, and has not
been conferred by the Constitution, nor by the statutes of this State, then no court in Texas has the
power to force any citizen to submit to a physical examination under such circumstances." Austin
& Nw. R.R. v. Cluck, 97 Tex. 172, 77 S.W. 403, 405 (1903). 
7. Rule 196.7 involves entry onto land, and is inapplicable. Tex. R. Civ. P. 202.1, et seq.
controls the method of obtaining depositions to perpetuate testimony or to investigate a potential
claim. Tex. R. Civ. P. 204.1, et seq. explains how a party may obtain an order compelling another
party to submit to physical or mental examination. 
8. We note that, had that procedural safeguard been applied, the late-filed affidavits and
exhibits tendered by the Hospital post-hearing, and four days before the order was signed, would not
have been considered. The rule requires such evidence to be served at least seven days before the
hearing. Tex. R. Civ. P. 193.4(a).
9. We recognize that Tex. R. Civ. P. 191.1 allows the procedures and limitations set out by the
rules of discovery to be modified by agreement, or by court order for good cause. Neither situation
exists in this case. There was no agreement, and there was no pleading or finding that good cause
existed to modify the rules of discovery in this suit.
10. Anonymous speech has a long history, including Alexander Hamilton's contributions to the
Federalist Papers in which he used the pseudonymn "Publius." See, e.g., The Federalist No. 23
(Alexander Hamilton). 
11. See Glenn Harlan Reynolds, Libel in the Blogosphere: Some Preliminary Thoughts, 84
Wash. U.L. Rev. 1157 (2006); Daniel J. Solove, A Tale of Two Bloggers: Free Speech and Privacy
in the Blogosphere, 84 Wash. U.L. Rev. 1195 (2006).
12. In Cahill, the Delaware Supreme Court held that a public figure was not required to produce
evidence of actual malice since such proof would be almost impossible before the author is
identified. Cahill, 881 A.2d at 464 ("a public figure defamation plaintiff must only plead and prove
facts with regard to elements of the claim that are within his control"). The failure to require such
proof has been criticized. See McMann, 460 F.Supp.2d at 267. 

 The actual malice requirement is an additional level of constitutional protection that applies
only in particular circumstances for the imposition of liability, not discovery. A rule for identifying
anonymous writers should be one of general application rather than one attempting to incorporate
the special provision required for unusual situations. If an actual malice finding is required to
impose liability, that will be determined at a later stage of the proceedings.
13. Adapting the summary judgment standard to Texas procedure, the trial court should view
the matter as if Doe 1 had filed a traditional motion for summary judgment establishing its defense
by alleging that his identity was protected from disclosure by virtue of the First Amendment right
of free speech. To obtain the requested discovery, the Hospital would then be required to produce
evidence which would be sufficient to preclude the granting of a summary judgment. See M.D.
Anderson Hosp. & Tumor Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000) ("[t]he nonmovant has no
burden to respond to a summary judgment motion unless the movant conclusively establishes its
cause of action or defense").